NOTICE

Decision filed 01/23/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 210272-U

NO. 5-21-0272

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jefferson County. |
| | ) | |
| v. | ) | No. 20-CF-172 |
| | ) | |
| LEE V. DAVIS, | ) | Honorable |
| | ) | Jerry E. Crisel, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Justices Welch and McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*: Cause remanded with directions for the trial court to conduct a hearing to address the defendant's *pro se* ineffective assistance of counsel claims, as required by *People v. Krankel*, 102 Ill. 2d 181 (1984), and to determine, based on the trial court's conclusion following the hearing, whether additional proceedings are required.

¶ 2    The defendant, Lee V. Davis, appeals his conviction and sentence, following a jury trial in the circuit court of Jefferson County, for being an armed habitual criminal.

¶ 3    For the reasons that follow, we remand this cause for the limited purpose of a proper *Krankel* inquiry in the circuit court. Prior to doing so, we examine the defendant's first claim that the State failed to prove him guilty beyond a reasonable doubt, because, as the defendant correctly notes, if he prevails on this claim there is no need to remand for a *Krankel* inquiry, because the principles of doubly jeopardy would bar the retrial of the defendant. However, also for the reasons that follow, we reject the defendant's sufficiency of the evidence claim. We do not reach the

1

remaining issues raised by the defendant, but retain jurisdiction to consider them, if necessary, following the *Krankel* inquiry. See, *e.g.*, *People v. Bell*, 2018 IL App (4th) 151016, ¶¶ 3, 36-37; see also *People v. Roberson*, 2021 IL App (3d) 190212, ¶ 22.

¶ 4                                    I. BACKGROUND

¶ 5     We recite only those facts necessary for an understanding of our disposition of this appeal. On June 15, 2020, the defendant was charged, by information, with one count of armed habitual criminal (AHC), a Class X felony. It alleged that on June 13, 2020, the defendant knowingly possessed a firearm after having been convicted of two prior qualifying felony offenses. On June 18, 2020, a grand jury returned a true bill of indictment charging the defendant with the same.

¶ 6     On March 30, 2021, selection of the jury for the defendant's trial began. Opening statements were given on March 31, 2021, and the State began its case-in-chief.

¶ 7     The State's first witness to testify was Officer Braden Kelley. He testified that he was employed by the Mount Vernon Police Department as a patrol officer and had been employed there for three years. Kelley testified that while on duty on June 13, 2020, at approximately 3:30 a.m., dispatch informed him that the defendant was in the 800 block of South 19th Street. It was known at that time that the defendant had a current arrest warrant. He testified that he and Officer Wesley Song responded to the area and parked at the Corner Tavern to approach the defendant on foot rather than in marked patrol vehicles. Kelley testified they observed a maroon Charger parked on the east side of the street in front of 816 South 19th Street, which matched the description of the vehicle reported by dispatch. He testified he observed someone in the driver's seat but was unable to identify the person at that time. As they approached the vehicle, Sergeant Travis Chapman drove past the maroon Charger in his marked patrol vehicle. Kelley testified this "spooked" the driver and he exited the vehicle, slumped over, and began to walk away from them. Kelley demonstrated for jurors the manner in which the driver "slumped" and walked. He testified

the individual had his right hand in front of his face and he could not observe the other hand. Once the individual reached the shadow of a house, he began to flee by running east through the yard of 816 South 19th Street.

¶ 8     Kelley testified he and Song pursued the individual on foot, commanded him to stop, and identified themselves as police. The individual did not stop, and continued until he reached the alley on the east side of 816 South 19th Street, where he turned and ran north. Kelley testified he dropped behind Song to let him gain primary on the pursuit. Kelley lost sight of the individual in the back yard of 816 South 19th Street. He then followed behind Song until they reached Conger Avenue. Both officers stopped at Conger Avenue because they had lost sight of the individual. Kelley testified he looked west and saw the same individual running south through the intersection of 19th Street and Conger Avenue back toward the maroon Charger. He testified he knew it was the same individual, because he was wearing the same clothing—a long pair of black shorts and a black t-shirt with logos and designs. He and Song reengaged the pursuit and observed the individual get back into the driver seat of the maroon Charger. Kelley testified he approached the vehicle and gave commands for the individual to exit. The individual complied and Song placed him into custody. Kelley testified he was able to identify the individual as the defendant, Lee Davis, and confirmed he had an outstanding warrant. He further testified that the defendant was placed in Chapman's patrol vehicle for transport to the county justice center.

¶ 9     Kelley testified that he and Song remained on scene to search for possible evidence along the defendant's flight path. Deputy Kevin Rodriguez arrived on scene with his canine partner to assist in completing an article search along the defendant's flight path. Kelley testified that Rodriguez and his canine partner led the front of the search with Song and Kelley approximately 10 to 15 feet behind on the left and right respectively. He testified that Song located a revolver on the left side of the alley a couple of feet off the path that the defendant had recently fled. Kelley

3

testified the revolver was lying in the weeds on its right side. He testified that it was black and silver in color with a brown handle and appeared to be in operating condition. The revolver was first photographed as it lay and then Song put on gloves, picked it up, and observed live rounds of ammunition in the cylinder. Kelley testified he took photographs of the weapon with the live rounds while Song held it. The revolver was then secured in Song's patrol vehicle. He testified that no other items or articles were located during the search of the flight path.

¶ 10   Kelley was shown People's exhibits 1A through 1V, which he identified generally as photographs of the defendant's flight path. He testified he took some of the photographs but not all of them. Additionally, he testified he took the photographs on September 14, 2020, and that they truly and accurately depicted a fair representation of the flight path. The photographs were admitted into evidence, without objection, and published to the jury. He testified that exhibit 1H showed a close view of the area where the firearm was located. Exhibits 1I, 1J, 1K, and 1L showed a pothole or uneven space in the alleyway along the flight path. The remaining exhibits were photographs of the alleyway, intersections, and roadways along the defendant's flight path. Kelley was shown People's exhibit 2, which he identified as a street view or Google Earth view of the defendant's flight path. He testified that the flight path could be contained within the photograph, and that it was a true and accurate depiction of the streets of Mount Vernon. The photograph was admitted into evidence, without objection, and published to the jury. Kelley demonstrated for the jury, utilizing a laser pointer, the defendant's flight path.

¶ 11   On cross-examination, Kelley testified that he did not observe the defendant fall down, and that the area is not necessarily a high crime area, but a high call area. On redirect examination, he testified that he has never found any other discarded loaded weapons in that area. On recross-examination, Kelley testified the only time he has searched that alleyway for a weapon was on the night in question.

4

¶ 12    Ray Gilbert was the next witness to testify. He testified that he was a sergeant with the Mount Vernon Police Department. Gilbert testified he supervised a squad of night shift officers, and he was the evidence custodian for "all of the evidence at the police department." He described his duties as correctly securing, storing, transferring, and maintaining chain of custody for evidence. He testified to the proper protocols and procedures required for collecting, receiving, packaging, storing, and maintaining evidence. Gilbert testified he not only maintains a physical record, but also an electronic record of each individual piece of evidence. He testified that in this case, he transferred all the items of evidence related to this case to the Jefferson County Circuit Clerk while adhering to the proper protocols and procedures.

¶ 13    Wesley Song was the next witness to testify. He testified that he was a patrol officer with the Mount Vernon Police Department and had been for approximately three years. Song testified that on June 13, 2020, dispatch advised that Lee Davis was in a maroon Charger in the 800 block of South 19th Street, and he had a current arrest warrant. He testified that he reviewed in-house photos of Lee Davis so that he would be able to identify him. Song testified that he and Officer Kelley responded to the area and parked at the Corner Tavern to approach the defendant on foot rather than in marked patrol vehicles. He testified it was approximately 3:40 a.m. and dark out when they began to walk northbound on 19th Street and they observed the maroon Charger parked near 816 South 19th Street. Song testified he observed a male sitting in the driver's seat. As he and Kelley approached, Sergeant Chapman happened to drive southbound on 19th Street. He testified that he observed the male exit the maroon Charger slumped over and walking eastbound toward the back yard of the residence at 816 South 19th Street. Song demonstrated for the jury the manner in which the defendant "slumped" and walked. He testified he was not able to see the male's hands at this time.

¶ 14    Song testified the male took off running when he reached the back yard of the residence, and he and Kelley chased after him announcing "police and to stop running." He testified the male did not stop running, and instead, turned northbound in the alleyway. Song testified he lost sight of the male for "a matter of seconds" when he turned and ran northbound through the alleyway. He testified he quickly regained sight of the male when he made it to the alleyway and looked northbound. Song testified the male was wearing a black shirt and long jean shorts. He testified he continued to pursue the male down the alleyway but lost sight of him near Conger Avenue. Song and Kelley paused briefly when they reached Conger Avenue and regained sight of the male now running southbound on 19th Street back toward the maroon Charger. Song testified he and Kelley pursued the male again and observed him entering the maroon Charger. He testified as they approached the vehicle, they ordered him out and he complied. Song and Kelley identified the male as Lee Davis, and he was placed in custody. Song testified he searched the defendant and located a pair of gloves and a black skeleton mask on his person.

¶ 15    Song was shown People's exhibits 3 and 4, which he identified as the pair of gloves and black skeleton mask he removed from the defendant. He testified they were in substantially the same condition as the date of the crime. The exhibits were admitted into evidence, without objection, and published to the jury. Song testified that the gloves were dirty and that they were dirty when he removed them from the defendant on June 13, 2020.

¶ 16    Song testified that he and Kelley remained on scene to search the defendant's flight path for items that may have been thrown. Deputy Rodriguez and his canine partner arrived to assist in the search. Song testified Rodriguez and his canine partner led in the front and he and Kelley followed behind on the left and right respectively. He testified that he located a gun on the left side of the alley about 50 feet north of 816 South 19th Street. He testified he photographed the firearm

6

before disturbing it. Song testified he then collected the firearm and observed it loaded with ammunition.

¶ 17 Song was shown People's exhibit 5, which he recognized and identified as the box that contained the same black and brown revolver he had located in the alley. The exhibit was admitted into evidence, without objection, and published to the jury. Song was shown People's exhibit 6, which he identified as six rounds of .38-Special caliber ammunition that was located inside the revolver. He testified it is the same ammunition he removed from the revolver and had placed into evidence. The exhibit was admitted into evidence, without objection.

¶ 18 Song testified he took photographs of the firearm before he disturbed it and after he collected it for evidence. He also testified he took photographs of the gloves and mask. Song was shown People's exhibits 7A through 7H, which he identified as photographs of the gloves, mask, and revolver, and he testified that they truly and accurately depicted the condition of those items on June 13, 2020. The photographs were admitted into evidence, without objection, and published to the jury. Song testified that exhibit 7A showed the mask and the gloves in the same condition as when he removed them from the defendant. He testified that there appeared to be some kind of grass or weeds on the mask that came from the alleyway, and that he did not place it there. He testified that exhibit 7B showed the other side of the same mask and gloves. Song testified that exhibit 7C showed the location where the revolver had been discovered before it had been disturbed. Exhibit 7D showed Song holding the revolver with gloves exposing the loaded ammunition. He testified he wore gloves to protect the integrity of the revolver and any potential DNA. Exhibits 7C and 7D showed the gun covered in dust except for the handle of the gun. He testified exhibit 7E showed the right side of the revolver and a piece of grass in the hammer of the firearm. Song testified he did not place that piece of grass there. Exhibit 7F showed the left side of the firearm in the evidence box. He testified that the gun was on its right side when it was

initially recovered. Exhibit 7G showed a closer photograph of the right side of the firearm depicting the grass near the hammer. Exhibit 7H showed the six rounds of ammunition that were located in the firearm.

¶ 19    On cross-examination, Song testified that the piece of grass in the hammer of the firearm was fresh and green, and it was still on the gun at the time he placed it into evidence. Song was shown defendant's exhibit D, which he identified as the photograph he took of the firearm before it was disturbed and testified it fairly and accurately depicted the firearm at the scene. He testified he took one photograph of the gun on the ground. The exhibit was admitted without objection. Song was shown defendant's exhibit N, which he identified as the photograph of him holding the gun exposing the loaded ammunition, and testified he fairly and accurately depicted the weapon on June 13, 2020. The photograph was admitted without objection. Song further testified that the gun was located approximately 50 feet from the gate in the back yard of the residence at 816 South 19th Street. He testified that the gloves and mask were later seized by Officer Mayberry from the defendant's personal property at the county justice center and placed into evidence. He testified that the defendant did not have the gloves on his hands at the time he was taken into custody, and that the gloves were located in the defendant's pockets.

¶ 20    On redirect examination, Song testified that the gloves and mask were located on the defendant's person. He testified Officer Mayberry was advised to go to the county justice center and seize the mask and gloves from the defendant's personal property.

¶ 21    Travis Chapman was the next witness to testify. He testified that he was a sergeant with the Mount Vernon Police Department and had been for almost 14 years. He testified that on June 13, 2020, he received information from dispatch that Lee Davis was sitting outside 816 South 19th Street in a maroon Charger and he had an outstanding warrant. He responded to the area and drove past the maroon Charger and observed Song and Kelley walking on foot toward the vehicle. He

testified they called out a foot pursuit and he turned around his patrol vehicle and drove northbound on 19th Street toward Conger Avenue. He testified he observed a male running across Conger Avenue. He turned his vehicle into an alley and observed the male run behind a house in the 700 block of South 19th Street and lost sight of him. He testified he received information from Song and Kelley that the male was running back toward the maroon Charger located on South 19th Street. Chapman testified he circled back and drove toward that location. He testified Song and Kelley placed the defendant into custody and placed him in his patrol vehicle for transportation to the county justice center on the outstanding warrant. He testified the defendant was searched prior to being placed in his patrol vehicle, and that he transported the defendant and the property located on his person, including the gloves and mask, to the county jail.

¶ 22    Chapman testified, while at the booking area in the jail, he observed that the defendant's elbow and knees were "scraped up." He testified he took photographs of the defendant's injuries. Chapman was shown People's exhibits 8A and 8B, which he identified as the photographs he took of the defendant's injuries to his elbow and knees. The photographs were admitted into evidence, without objection, and published to the jury. Chapman testified that exhibit 8A showed the defendant's left forearm with a scrape and fresh blood. He testified that it also showed a little bit of dust on the defendant's shirt. He testified that exhibit 8B showed the defendant's injuries to his knees and dust on the front of his pants. On cross-examination, Chapman testified that he never observed the defendant fall down or stumble while fleeing in the area of South 19th Street.

¶ 23    The next witness was Kevin Rodriguez. He testified he was a patrol deputy with the Jefferson County Sheriff's Office and had been for three years. He testified that on June 13, 2020, he received information from dispatch that Lee Davis had an active warrant and was sitting in a maroon Charger in the 800 block of South 19th Street. Rodriguez testified he retrieved his canine partner and responded to the area. He testified the defendant had already been placed into custody

at the time of his arrival. He testified Kelley asked him to utilize his canine partner to search the flight path for any discarded items. Rodriguez testified he had received specialized training to handle a canine unit. He testified the canine was certified to detect the presence of narcotics as well as patrol functions. He testified that he, Song, Kelley, and his canine partner began a search of the area following the defendant's flight path. He testified his canine partner began to track and pull hard on the leash. He testified 50 feet into the alleyway he heard Song say he located a firearm. Rodriguez testified the location of the firearm was out of the parameter of where his canine partner would normally alert when tracking. He testified the area was too big to put the canine on an article search and believed tracking would be the best option with such a large area. He testified he observed a revolver lying in some grass. He testified he was present when Song and Kelley took photographs of the firearm. Rodriguez testified Song utilized gloves when picking up the weapon. On cross-examination, Rodriguez testified he did not take any photographs of the weapon.

¶ 24    Jeremy Reichert was the next witness to testify. He testified that he was a sergeant in the detective division with the Mount Vernon Police Department and had been for 22 years. He testified he was the main crime scene technician and that he processed and collected evidence. Reichert testified he received the revolver in this case to process for possible DNA or fingerprints. He testified that prior to processing the weapon, he photographed the sealed evidence box, the box after it was opened, and the revolver after it had been removed from the box. He testified he swabbed the common contact areas of the weapon for possible DNA, and then processed the firearm for possible latent prints. Reichert testified he placed the swabs for DNA in evidence to be sent to the Illinois State Police crime lab for analysis. He testified he examined the firearm for obvious latent prints. Reichert was shown People's exhibits 9A and 9B, which he identified as photographs he took of the firearm, and testified they fairly and accurately depicted the condition of the firearm when he processed it. The photographs were admitted into evidence, without

10

objection. He testified further that no latent prints suitable for comparison were located or developed on the firearm.

¶ 25 On cross-examination, Reichert testified that he swabbed for DNA first to prevent any alteration or damage to the potential DNA on the firearm. He testified he swabbed the grip, the hammer, and the trigger of the firearm for possible DNA. He testified that he examined the ammunition from the firearm, and he did not swab the ammunition for DNA and there were no latent prints suitable for comparison located.

¶ 26 On redirect examination, Reichert testified he did not swab the ammunition for DNA because it could potentially damage or remove possible fingerprints. He further testified that no suitable latent prints were located on the ammunition.

¶ 27 The trial court then read the following stipulation to the jury:

"Stipulation as to testimony of Robert Kane. 'The People of the State of Illinois and the defendant, Lee V. Davis, by and through counsel for the defendant, Matt Vaughn, agree and stipulate that if Robert Kane was sworn under oath, he would testify to the following.

(1) That Robert Kane is employed as a detective with the Mt. Vernon Police Department.

(2) That as part of his duties as a detective with the Mt. Vernon Police Department, Robert did take temporary custody of a piece of evidence related to this case, being a .38 Rohm and Gesellschaft revolver on March 1, 2021.

(3) That Robert Kane did take custody of this revolver by contacting Officer Ray Gilbert of the Mt. Vernon Police Department, obtaining a key to access a locked and secure evidence locker, and signing out a chain of custody sheet relating to his taking possession of the revolver.

11

(4) That Robert Kane then did transport the revolver to a local firing range and test fired the revolver using two .38 rounds of ammunition.

(5) That the .38-caliber Rohm Gesellschaft revolver did expel the two rounds of .38 ammunition via an external action of expulsion.

(6) That following the test firing of the .38-caliber Rohm Gesellschaft revolver, Robert Kane was able to determine that the revolver is an operable firearm.

(7) That following the test firing of the revolver, Robert Kane transported the revolver back to the Mt. Vernon Police Department and signed custody of the revolver back to Officer Ray Gilbert of the Mt. Vernon Police Department.' "

¶ 28     The trial court then read the following stipulation next to the jury:

"[S]tipulation as to testimony of Bobby Wallace. 'The People of the State of Illinois and the defendant, Lee V. Davis, by and through counsel for the defendant, Matt Vaughn, agree and stipulate that if Bobby Wallace were sworn under oath he would testify to the following.

(1) That Bobby Wallace is employed as a detective with the Jefferson County Sheriff's Office.

(2) That as part of his duties as a detective with the Jefferson County Sheriff's Office, Bobby Wallace did receive an order form this court on August 21, 2020, directing him to collect a buccal swab from Lee V. Davis.

(3) That Bobby Wallace provided a copy of this order to Lee V. Davis on August 21, 2020.

(4) That on August 21, 2020, Bobby Wallace utilized an Illinois State Police biological standard collection kit to collect a biological sample from the inside of Lee V. Davis' mouth.

12

(5) That Bobby Wallace then sealed the Illinois State biological standard collection kit and placed it in a secured evidence locker at the Jefferson County Sheriff's Office.' "

¶ 29　Jay Winters was the next witness to testify. He testified he was employed as a forensic scientist with the Illinois State Police at the Metro-East Forensic Science Laboratory in Belleville and had been for 15 years. He testified regarding his educational background and training. He testified that he held a Bachelor of Science degree in biology and sociology, was a member of the American Academy of Forensic Science, and had completed an 18-month forensic biology and DNA training program with the Illinois State Police. He testified that the Belleville laboratory is an accredited lab subject to examination and accreditation every year. Winters was tendered and accepted as an expert in forensic biology and forensic DNA analysis.

¶ 30　Winters testified that he was assigned to perform DNA analysis in the defendant's case. He testified he received known buccal swab standards from the defendant to be used for DNA comparison. He testified the results of his analysis on the swab of the firearm were a mixture of at least three individuals. Winters testified he was unable to form an opinion as to the source of the DNA profile, because it was a low-level degraded mixture of at least three people.

¶ 31　On cross-examination, Winters testified that degraded means that the DNA molecule has deteriorated from exposure to elements like sunlight, moisture, and heat. Winters was shown People's exhibit 5 and testified it is common for firearms to be placed in a cardboard evidence box of that type to prevent DNA evidence degradation.

¶ 32　On redirect examination, People's exhibit 10 was admitted into evidence, without objection. Winters testified that at least three people had DNA on the firearm and that the defendant could not be "ruled out," but based on his results, he cannot "conclusively prove" the defendant touched the firearm.

13

¶ 33   On recross-examination, Winters testified that he could not rule out that defense counsel touched the firearm, stating, "Any profile would be inconclusive."

¶ 34   Following a break in the trial, the State moved to admit People's exhibit 11, which was a certified copy of the defendant's conviction for unlawful possession of a weapon by a felon, based on the trial court's previous granting of the State's motion *in limine* regarding prior bad acts or conduct. The prior conviction was admitted into evidence, over the objection of defense.

¶ 35   The trial court then read the conviction and limiting instruction to the jury:

"Ladies and gentlemen, on the 19th day of July, 2006, the defendant, Lee V. Davis, was convicted of the felony of unlawful possession of a weapon by a felon in Jefferson County Case No. 06-CF-285.

* * *

*** I will show that that was read to the jury. Now, ladies and gentlemen, evidence has been received that the Defendant has been involved in an offense other than that charged in the indictment. This evidence has been received on the issues of the Defendant's intent, knowledge and absence of mistake and may be considered by you only for those limited purposes. It is for you to determine whether the Defendant was involved in those offenses and if so what weight should be given to this evidence on the issues of intent, knowledge and absence of mistake."

¶ 36   The trial court then read the following stipulation of facts to the jury:

"As approved by the Court, it is agreed that the parties in this case stipulate to the following facts. One, the defendant, Lee V. Davis, is charged with the offense of armed habitual criminal. Two, the defendant, Lee V. Davis, was previously convicted of two prior qualifying felony offenses under the offense of armed habitual criminal. Three, that as such People's Exhibits No. 12 and 13 are admitted into evidence."

14

¶ 37     People's exhibits 12 and 13, certified copies of defendant's convictions for aggravated discharge of a firearm and robbery, were then tendered to the circuit clerk.

¶ 38     Jeffery Clark was the next witness to testify. He testified he was a correctional officer with the Jefferson County Sheriff's Office and had been for 20 years. He testified that on June 15, 2020, he was assisting with video court that day. He explained that he takes inmates down to a training room for video court to have their first appearance. He testified he took the defendant to video court for his first appearance that day. Clark testified that during the defendant's first appearance on one of his charges, he heard the defendant state that he was not in town in 2008 when the warrant was issued. He testified he believed that meant the defendant was not aware of the outstanding warrant. The State then rested its case.

¶ 39     The defense did not call any witnesses and rested. A jury instruction conference was then held. There were no objections made to proposed instructions that are relevant to this appeal. The defendant tendered one additional instruction that was not objected to by the State.

¶ 40     Following closing arguments, the jury retired to deliberate and returned a verdict finding the defendant guilty of being an armed habitual criminal.

¶ 41     On April 28, 2021, the defendant filed a *pro se* posttrial motion entitled "Defendant's Appeal of Conviction." In paragraph 10 subsection 5, the defendant made the following claim:

"Defense was not effective to say the least. He was not forth-coming of the lack of forensic evidence relating Defendant to said firearm, which, if made known by disclosure of the State, said trial would not have commenced, for the Defendant's charge would have been dropped and dismissed without prejudice by the Judge upon Motion by Defense Counsel."

The defendant's *pro se* motion was never addressed by the trial court.

¶ 42     On May 26, 2021, the defendant filed a motion for a new trial and to vacate the jury verdict. On May 27, 2021, the defendant was sentenced to serve 20 years in the Department of Corrections,

15

followed by 3 years of mandatory supervised release (MSR). On June 3, 2021, the State filed a motion to strike the defendant's motion for a new trial. On June 7, 2021, the defendant filed a motion to reconsider the sentence. On September 7, 2021, the State's motion to strike defendant's motion for a new trial was heard and granted, and the defendant's motion to reconsider the sentence was heard and denied. The defendant filed a timely notice of appeal on September 8, 2021.

¶ 43                                   II. ANALYSIS

¶ 44                          A. Sufficiency of the Evidence

¶ 45    On appeal, the defendant first contends that the evidence adduced at his jury trial was not sufficient to sustain his conviction of being an armed habitual criminal. To sustain a conviction for the offense of being an armed habitual criminal, the State must prove that the defendant knowingly possessed a firearm after having been convicted two or more times of a qualifying offense. 720 ILCS 5/24-1.7 (West 2020). On appeal, the defendant only contests whether the evidence was sufficient as to the element of whether he possessed a firearm.

¶ 46    When a defendant makes a claim that there was insufficient evidence to sustain his conviction, this court reviews the evidence presented at trial in the light most favorable to the prosecution to determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime or crimes of which the defendant was convicted. *People v. Saxon*, 374 Ill. App. 3d 409, 416 (2007). We will not reverse a criminal conviction unless the evidence presented at trial is so improbable or unsatisfactory as to justify a reasonable doubt as to the guilt of the defendant. *Id.* We allow all reasonable inferences from the record in favor of the prosecution, whether the evidence in the case is direct or circumstantial. *Id.* Circumstantial evidence alone, if it satisfactorily proves the elements of the offense beyond a reasonable doubt, will sustain a criminal conviction. *People v. Jackson*, 2020 IL 124112, ¶ 64.

¶ 47 There is no requirement that this court disregard inferences that flow from the evidence, or that this court search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. *Id.* at 416-17. We do not retry the defendant, instead leaving it to the trier of fact to judge the credibility of witnesses, resolve conflicts in the evidence, and draw reasonable inferences based upon all of the evidence properly before the trier of fact. *Id.* at 416

¶ 48 In this case, the defendant posits that the State failed to prove beyond a reasonable doubt that he possessed the firearm located in the alleyway along the defendant's flight path. He contends, *inter alia*, that the evidence only demonstrates that he ran down the alley where the gun was located. He argues that there is no direct evidence linking him to the gun. Further, the State did not produce any witnesses at trial that testified they observed the defendant possess a gun. Defendant alleges that he never gave any incriminating statements to officers claiming he possessed the gun. He argues that officers did not observe him holding or discarding a gun, and neither officer observed him fall down during the pursuit. Defendant further alleges that the location where the firearm was recovered is a "high call" area and the dirty condition of the gun is evidence that the gun had been lying in the alleyway for a much longer period. Additionally, the defendant contends that the "low level degraded mixture" DNA evidence on the gun from at least three people did not connect him to the gun in any way and that there were no fingerprints on the gun or ammunition suitable for comparison. In essence, the defendant contends that there is no physical evidence or eyewitness testimony connecting him to the gun, and the State's circumstantial evidence is too "speculative" to support his conviction. As such, the defendant argues that under these circumstances, no rational trier of fact could conclude that the State proved that the defendant possessed the gun.

¶ 49 In its brief on appeal with regard to this issue, the State counters that when the defendant exited the maroon Charger, he "slumped" over and started walking away from them. The defendant

had his right hand in front of his face and officers could not see his left hand or left arm. The State contends that the manner in which the defendant walked supports an inference he was hiding a weapon. In addition, the State argues that the defendant's flight and refusal to stop after commands is circumstantial evidence demonstrating the defendant's consciousness of guilt. As such, the defendant's flight supports the inference that the defendant possessed the gun. Further, the fact the defendant returned to the maroon Charger, where the pursuit began, and then complied with officers' commands is circumstantial evidence in support of the defendant fleeing for the purpose of discarding the gun. Moreover, evidence at trial that the defendant was unaware of his outstanding warrant supports that he fled for another purpose, to discard the gun. The State argues that the gun was located along the defendant's flight path, a couple feet off the path, within minutes of the defendant having run down it. Further, there was no evidence that anyone but the defendant was in that alleyway on the morning of June 13, 2020.

¶ 50    Additionally, the State argues that there was a pothole or uneven ground in the alleyway near where the gun was located. Although officers did not observe the defendant fall, officers observed dust on his shirt and pants and injuries to his elbow and knees. Further, the gloves located on the defendant were dirty, and the skeleton mask on his person, when viewed at trial, appeared to have grass or weeds on it. In relation, the gun also appeared to be covered in dust, except for the grip, suggesting the defendant fell and that the gun had recently been handled. Also, the piece of green grass lodged near the hammer of the gun suggests that the gun was recently discarded and had not been lying there for a long period of time. The State contends that the gloves found in the defendant's pockets are circumstantial evidence supporting the lack of fingerprints and DNA evidence on the gun. The State notes that possession of a firearm may be actual or constructive, and that in this case there was sufficient evidence to establish both actual possession and constructive possession.

¶ 51    In his reply brief, the defendant argues that the State did not prove possession because there was no direct evidence establishing the defendant possessed the gun. Further, he argues that the gun was not located near the defendant at the time he was taken into custody, but that it was discovered several feet off the path of the alleyway he had run down. The defendant argues that mere presence in the vicinity or access to the area in which contraband is found is insufficient to establish constructive possession. Additionally, officers never saw the defendant fall or discard a firearm, and it is not certain the pothole or uneven ground in the alleyway existed on June 13, 2020, because the photographs of the pothole were taken months after the incident. Lastly, the defendant argues that the defendant may have fled, not because he possessed a gun, but because it is "possible Mr. Davis was intoxicated and not thinking clearly." Thus, he contends that possession was not established, and criminal convictions cannot be based on speculation.

¶ 52    As explained above, when reviewing a sufficiency of the evidence claim, this court allows all reasonable inferences from the record in favor of the prosecution, whether the evidence in the case is direct or circumstantial, and will not disregard such reasonable inferences that flow from the evidence. See, *e.g.*, *Saxon*, 374 Ill. App. 3d at 416-17. Moreover, we (1) do not retry the defendant, instead leaving it to the trier of fact to judge the credibility of witnesses, resolve conflicts in the evidence, and draw reasonable inferences based upon all of the evidence properly before the trier of fact, and (2) will not search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt (see *id.*), both of which are exactly what the defendant asks us to do in this appeal.

¶ 53    "Circumstantial evidence is proof of facts or circumstances that give rise to reasonable inferences of other facts that tend to establish guilt or innocence of the defendant." *Id.* at 417. It is axiomatic that "[a] defendant can be convicted solely on circumstantial evidence," and that "[t]he

19

trier of fact does not have to be satisfied beyond a reasonable doubt as to each link in the chain of circumstantial evidence." *Id.*

¶ 54 Possession of a firearm may be actual or constructive. *People v. Ingram*, 389 Ill. App. 3d 897, 899 (2009).

> "Actual possession is the exercise by the defendant of present personal dominion over the illicit material [citation] and exists when an individual exercises immediate and exclusive dominion or control over the illicit material [citation]. Actual possession does not require present personal touching of the illicit material but, rather, present personal dominion over it. [Citation.] *** Where possession has been shown, an inference of guilty knowledge can be drawn from the surrounding facts and circumstances. [Citation.] The fact of possession must be shown beyond a reasonable doubt. [Citation.]" *People v. Schmalz*, 194 Ill. 2d 75, 82 (2000).

"Constructive possession exists where there is no actual, personal, present dominion over contraband, but defendant had knowledge of the presence of the contraband, and had control over the area where the contraband was found." *People v. Hunter*, 2013 IL 114100, ¶ 19.

¶ 55 The evidence that was presented to the jury is described in detail above, and when viewed in the light most favorable to the prosecution, that evidence was sufficient, beyond a reasonable doubt, to sustain the conviction on appeal. The defendant "slumped over" and walked away from officers in a manner unusual enough to attract the attention of both officers. The defendant slumped over and used his right hand to hide his face and officers testified his left hand was not visible. Evidence that the defendant was unaware of his outstanding warrant coupled with his flight from officers establishes the defendant's consciousness of guilt and supports an inference he possessed the gun later discovered in the alleyway. Further, the defendant's return to the vehicle where the pursuit began and sudden compliance with officers is circumstantial evidence in support that the

defendant fled for the purpose of discarding the gun. The gun's location was no more than a few feet off the defendant's flight path and there was no evidence that anyone else was present in the alley at the time. Although the defendant contends that mere presence in the vicinity or access to the area in which contraband is found is insufficient to establish constructive possession, we find that there was sufficient, additional evidence to support a finding that the defendant possessed the gun. Specifically, the defendant, his clothing, the gloves in his possession, and the gun were all covered in dust to varying degrees. Moreover, the gun had a piece of green grass wedged in the hammer suggesting that the gun was recently discarded. Further, the mask in defendant's possession also appeared to have some type of grass or weeds on it. These facts elevate the evidence beyond mere presence in the vicinity of the gun and establish some degree of nexus between the firearm and the defendant. Additionally, the defendant's possession of gloves in the middle of summer coupled with the fact that the handle of the gun was absent of dust is circumstantial evidence of the gun being recently handled and would also support the lack of fingerprints or DNA evidence on the gun or ammunition. For all of these reasons, we find there was sufficient evidence to prove beyond a reasonable doubt that the defendant knowingly possessed the handgun, and the principles of double jeopardy do not apply.

¶ 56                                         B. *Krankel*

¶ 57    With regard to the defendant's third issue, he argues that this case must be remanded for a *Krankel* inquiry into his *pro se* posttrial claims of ineffective assistance of counsel. The defendant claims that his *pro se* motion entitled "Defendant's Appeal of Conviction" filed on April 28, 2021, sufficiently raised claims of ineffective assistance of counsel and the trial court failed to conduct any type of preliminary inquiry into that claim.

¶ 58    In response, the State argues that the defendant's *pro se* motion was not a clear claim triggering the trial court's duty to conduct a preliminary *Krankel* inquiry. In support, the State

claims the title of the defendant's motion and his prayer for relief indicate the defendant was attempting to appeal his conviction, not raise an ineffective claim. Thus, it was unclear whether the trial court was required to address the defendant's *pro se* motion when he was represented by counsel. Furthermore, the State argues that the specific language or "substance" of the defendant's motion in contention, especially when read together with the defendant's other claims, is subject to different interpretations and not an explicit claim. Thus, it is insufficient to trigger a preliminary inquiry by the trial court.

¶ 59 We begin by noting our standard of review. "The issue of whether the trial court properly conducted a preliminary *Krankel* inquiry presents a legal question"; therefore, we will use a *de novo* standard of review. *People v. Jolly*, 2014 IL 117142, ¶ 28.

¶ 60 In 1984, the Illinois Supreme Court in *Krankel* announced the manner in which the court should handle ineffective assistance of counsel posttrial claims. *People v. Krankel*, 102 Ill. 2d 181 (1984). Since that time, and in accordance therewith, a common law procedure has developed that "is triggered when a defendant raises a *** posttrial claim of ineffective assistance of trial counsel." *Jolly*, 2014 IL 117142, ¶ 29. It is well-settled law that in such situations, the trial court is not automatically required to appoint new counsel for a defendant. *Id.* "If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *** motion." *People v. Moore*, 207 Ill. 2d 68, 78 (2003). If, on the other hand, "the allegations show possible neglect of the case, new counsel should be appointed" to represent the defendant at a hearing on the defendant's claims. *Id.* This ensures that newly appointed counsel can independently evaluate the defendant's allegations, and it also avoids "the conflict of interest that trial counsel would experience if trial counsel had to justify his or her actions contrary to [the] defendant's position." *Id.*

22

¶ 61     To determine whether the appointment of new counsel is required, the trial court must take action. The first step is to "examine the factual basis of the defendant's claim." *Id.* at 77-78. To do this, "some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim." *Id.* at 78. The trial court may ask the trial counsel to "simply answer questions and explain the facts and circumstances surrounding the defendant's allegations." *Id.* Further, "[a] brief discussion between the trial court and the defendant may be sufficient" to assist the trial court in understanding the defendant's allegations. *Id.* Lastly, the trial court may base its evaluation of the defendant's allegations on its own "knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Id.* at 79.

¶ 62     The goal of a preliminary *Krankel* inquiry "is to facilitate the trial court's full consideration of" the defendant's claims. *Jolly*, 2014 IL 117142, ¶ 29. Moreover, by conducting the initial evaluation of the defendant's claims by such an inquiry, the trial court "will create the necessary record for any claims raised on appeal." *Id.* ¶ 38. To ensure this goal of the preliminary *Krankel* inquiry is met, "[t]he law requires the trial court to conduct some type of inquiry into the underlying factual basis" of the ineffective assistance of counsel claims, and if no such inquiry is conducted, the cause must be remanded to the trial court for that purpose. *Moore*, 207 Ill. 2d at 79, 80. As the Illinois Supreme Court has recognized, even where a defendant's claims may ultimately be without merit, the trial court must afford " 'the defendant the opportunity to specify and support his complaints,' " and the trial court may not " 'precipitously and prematurely' " deny the defendant's motion. *Id.* at 80 (quoting *People v. Robinson*, 157 Ill. 2d 68, 86 (1993)).

¶ 63     However, as in any case that is remanded for a proper preliminary *Krankel* inquiry, if, after a proper inquiry and any results that may flow from it, the trial court ultimately determines that

23

the defendant's claims are without merit, "the court may then deny the motion and leave standing [the] defendant's convictions and sentences." *Id.* at 81. If that happens, the defendant remains able to "appeal his assertion of ineffective assistance of counsel along with his other assignments of error." *Id.* at 81-82.

¶ 64　The Illinois Supreme Court has made clear that a *pro se* defendant is not required to do anything more than bring his claim to the court's attention and may do so orally or in writing. *In re Johnathan T.*, 2022 IL 127222, ¶¶ 24, 47. "[A] bare allegation of 'ineffective assistance of counsel,' without more, is sufficient to warrant a preliminary *Krankel* inquiry." *People v. Downing*, 2019 IL App (1st) 170329, ¶ 55 (citing *People v. Ayers*, 2017 IL 120071, ¶ 24); see also, *e.g.*, *People v. Patrick*, 2011 IL 111666, ¶ 39; *People v. Munson*, 171 Ill. 2d 158, 200 (1996) (all supporting the general proposition that a defendant is not required to file any sort of specific motion, and simply a letter or note to the court will suffice, and that even if the defendant does not specifically include the words "ineffective assistance of counsel" in the defendant's filing or oral statement, the allegations can be sufficient to require a *Krankel* inquiry).

¶ 65　In this case, the defendant's *pro se* motion contained the following language in paragraph 10 subsection 5:

"Defense was not effective to say the least. He was not forth-coming of the lack of forensic evidence relating Defendant to said firearm, which, if made known by disclosure of the State, said trial would not have commenced, for the Defendant's charge would have been dropped and dismissed without prejudice by the Judge upon Motion by Defense Counsel."

¶ 66　We find that the language set forth in defendant's *pro se* motion was sufficient to trigger the requirement that a preliminary *Krankel* inquiry be conducted, particularly when one is mindful of the fact that *Krankel* inquiries always result from *pro se* claims, and it would not be realistic to expect or require a *pro se* criminal defendant to use the precise or artful language one would

24

require of a licensed attorney. Further, we note that the record reveals the trial court and the attorneys of record were aware of defendant's *pro se* motion due to the trial court's docket entry on April 30, 2021, two days after the defendant's motion was filed which documented that a copy of the defendant's motion was distributed to the State and public defender. Accordingly, we reject the State's argument that the defendant failed to make a sufficient or clear ineffective claim and remand this case with directions for the trial court to conduct a *Krankel* hearing.

¶ 67                                    III. CONCLUSION

¶ 68    For the foregoing reasons, we remand with directions for the trial court to conduct a hearing to address the defendant's *pro se* ineffective assistance of counsel claims, as required by *People v. Krankel*, 102 Ill. 2d 181 (1984), and to determine, based on the trial court's conclusion following the hearing, whether additional proceedings are required.


¶ 69    Cause remanded with directions.